```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/7/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MONIQUE WILLIAMS,

                Plaintiff,

     -v-

NYC HEALTH AND HOSPITALS CORPORATION,

                Defendant.
-----------------------------------------------------------------X

24-cv-5467 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Monique Williams ("Plaintiff") alleges that NYC Health and Hospitals Corporation ("H+H" or "Defendant") violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"), the New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, *et seq.* ("NYCHRL") by discriminating against her on the basis of her disability and failing to accommodate her. Dkt. No. 21 ("Am. Compl."). Defendant moves to dismiss Plaintiff's amended complaint pursuant to the Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 27.

      For the following reasons, the motion to dismiss is granted.

## BACKGROUND

      For the purposes of this motion, the Court accepts as true the allegations of Plaintiff's complaint.

      H+H is a public benefit corporation headquartered in New York, New York. Am. Compl. ¶ 12. Plaintiff is an individual who worked for H+H from 2018 through 2021. *Id.* ¶ 21. At all relevant times, including throughout the entirety of her employment with H+H, Plaintiff suffered from anemia. *Id.* ¶ 13. The complaint states:

According to the Mayo Clinic:[1]

> Anemia is a problem of not having enough healthy red blood cells or hemoglobin to carry oxygen to the body's tissues. Hemoglobin is a protein found in red cells that carries oxygen from the lungs to all other organs in the body. Having anemia can cause tiredness, weakness and shortness of breath. There are many forms of anemia. Each has its own cause. Anemia can be short term or long term. It can range from mild to severe.

*Id.*

Plaintiff began working for H+H on or about November 18, 2018 as an "Assistant Director of Cost Accounting."  *Id.* ¶ 20.  Plaintiff's primary tasks and responsibilities were to review financial numbers and provide recommendations on how to best manage department budgets within H+H.  *Id.* ¶ 21.  The position was not a patient-facing one.  *Id.* at ¶ 20. Prior to the outbreak of COVID-19, Plaintiff worked out of an office located in New York City.  *Id.*  Throughout Plaintiff's employment, she routinely received compliments for her work performance and at all times performed her job in a satisfactory manner.  *Id.* ¶ 23.

Around mid-March 2020, Plaintiff began working remotely in a full-time capacity.  *Id.* ¶ 25.

At some point in early to mid-August 2021, Plaintiff contracted COVID-19 and became ill.  *Id.* ¶ 27.  She visited an H+H doctor for treatment.  *Id.*  During that visit, Plaintiff was informed that she should not receive the COVID-19 vaccine for at least 90 days.  *Id.* ¶ 28.  That advice comported with the contemporary guidance from the Centers for Disease Control and Prevention ("CDC") that individuals who contracted COVID-19 should wait about three months from the date of infection before getting the vaccine.  *Id.* ¶ 29.

On August 26, 2021, the New York Department of Health enacted an emergency rule

---

[1] The Mayo Clinic is a private American academic medical center focused on integrated healthcare, education, and research. *About Mayo Clinic,* MAYO CLINIC, https://www.mayoclinic.org/about-mayo-clinic (last visited Apr. 9, 2025).

requiring that covered entities, such as hospitals "require personnel to be fully vaccinated against COVID-19." 10 N.Y.C.R.R. § 2.61 (Aug. 26, 2021).[2] The rule also provided for certain time-limited medical exemptions. *See* 10 N.Y.C.R.R. § 2.61(d)(1). Specifically, the rule provided that "[i]f any licensed physician or certified nurse practitioner certifies that immunization with COVID-19 vaccine is detrimental to the health of member of a covered entity's personnel, based upon a pre-existing health condition, the requirements of this section relating to COVID-19 immunization shall be inapplicable only until such immunization is found no longer to be detrimental to such personnel member's health." *Id.* The rule further specified that "[t]he nature and duration of the medical exemption must be stated in the personnel employment medical record, or other appropriate record, and must be in accordance with generally accepted medical standards, . . . and any reasonable accommodation may be granted and must likewise be documented in such record." *Id.*

In or around late August or early September 2023, H+H instituted a COVID-19 vaccine mandate for all of its employees, including Plaintiff. Am. Compl. ¶ 26. Nonetheless, throughout the summer and fall of 2021, Plaintiff's supervisor told her that there was no need to Plaintiff to get vaccinated because Plaintiff was working remotely and was not patient-facing. *Id.* ¶ 30. Ultimately, however, in November 2021, H+H sent Plaintiff emails stating that she needed to get vaccinated. *Id.* ¶ 31.

On November 16, 2021, Plaintiff met with her hematologist, Dr. Bartosz Walczyszyn, regarding her anemia. *Id.* ¶ 32. In light of Plaintiff's anemia, Dr. Walczyszyn advised against getting the vaccine at that time. *Id.* That same day, Plaintiff requested that H+H give her a

---

[2] Courts may take judicial notice of agency rules and regulations. *See U.S. v. Knauer*, 635 F. Supp. 2d 203, 206 n.2 (E.D.N.Y.) (collecting cases).

3

reasonable accommodation for her blood disorder. *Id.* ¶ 34. She provided a letter from Dr. Walczyszyn, which stated, in relevant part:

> [Plaintiff] has undergone a Hematology/Oncology evaluation with me for a symptomatic blood disorder. . . . [A]ny reaction to the vaccine may be additive to the symptoms she is already experiencing from her underlying hematologic condition. Given proof of persistent immunity based on antibody titers, I recommend holding off on anti-COVID inoculation at this time until her blood issue is dealt with as this will help minimize any potential health complications.

*Id.* (alterations in original).

On November 18, 2021, H+H denied Plaintiff's request for an accommodation. *Id.* ¶ 37. The following day, November 19, 2021, Jasmin Wu (H+H's Assistant Director of Central Office Human Resource Operations) sent Plaintiff an email suspending Plaintiff's employment without pay "until [Plaintiff's] compliance with the New York State COVID-19 Vaccination Mandate." *Id.* ¶ 38. Plaintiff emailed H+H's Director of Human Resources asking how she could appeal the denial of her request for accommodation. *Id.* ¶ 40.

On November 23, 2021, H+H's Senior Vice President of Human Resources, Yvette Villanueva, sent an email stating:

> [O]ur records indicate that you have not complied with the NYS Mandate COVID-19 Vaccination, Second Dose. If you do not become fully vaccinated, you will be separated from NYC Health +Hospitals on Monday, November 29, 2021.

*Id.* ¶ 41. Plaintiff responded to Villanueva on November 24, 2021, questioning the decision and stating that complying with the vaccination requirement would contradict Dr. Walczyszyn's medical advice. *Id.* ¶ 43. Later that day, H+H's Office of Equal Employment Opportunities emailed Plaintiff explaining that: "Your medical condition does not support a contraindication to the COVID-19 vaccines as determined by current [CDC] guidance." *Id.* ¶ 44. Plaintiff continued to email H+H personnel that she could not receive both rounds of the vaccine by November 29, 2021 and requesting a temporary accommodation. *Id.* ¶ 45.

On November 29, 2021, H+H's Human Resource Department emailed Plaintiff stating that she was required to submit proof of vaccination that day. *Id.* ¶ 46. Plaintiff responded to the email, stating that she was not refusing the vaccination, but was being denied reasonable accommodation, and was requesting a delay until she could be cleared for vaccination by her physician. *Id.* ¶ 47. In response, H+H stated:

> The medical review committee did not find that the supplied medical documentation supported an exemption . . . No further extension is approved. . . . If you do not become fully vaccinated, you will be separated from NYC Health + Hospitals on Monday, November 29, 2021.

*Id.* ¶ 48.

The following day, November 30, 2021, Plaintiff visited her hematologist, who cleared her to receive the COVID-19 vaccine. *Id.* ¶ 51. The hematologist also provided her with a letter, which stated:

> Based on my most recent evaluation her blood condition did stabilize after treatments in October of 2021. As stated in my previous letter we were awaiting improvement in [Plaintiff]'s Hematologic condition prior to her getting vaccinated. At this time I do clear her for COVID inoculation with Pfizer being the preferred vaccine.

*Id.* Plaintiff emailed the letter to H+H that day. *Id.* ¶ 53. The next day, December 1, 2021, Villanueva told Plaintiff that H+H was terminating Plaintiff for failing to comply with the COVID-19 vaccination requirement. *Id.* ¶ 56. Plaintiff received the first dose of the COVID-19 vaccine on December 4, 2021, and received the second dose on January 24, 2022. *Id.* ¶ 57.

## PROCEDURAL HISTORY

Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunities Commission ("EEOC") on May 17, 2024. *Id.* ¶ 9.

She initiated this suit by filing a complaint on July 19, 2024. Dkt. No. 1. Plaintiff filed an amended complaint on October 29, 2024. Am. Compl. The amended complaint alleges causes of

5

action for unlawful discrimination and failure to provide reasonable accommodation under the: (1) ADA; (2) NYSHRL; and (3) NYCHRL. *Id*. ¶¶ 75–84. On December 27, 2024, H+H filed the instant motion to dismiss the amended complaint. Dkt. No. 25. H+H filed a declaration and memorandum of law in support of the motion. Dkt. Nos. 26–27. Plaintiff filed a memorandum of law in opposition to the motion on January 24, 2025. Dkt. No. 30. On February 6, 2025, Defendant filed a reply memorandum of law in further support of the motion to dismiss. Dkt. No 34.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

DISCUSSION

**I.  ADA**

To plead failure to accommodate under the ADA, the complaint must allege that: (1) plaintiff is disabled within the meaning of the ADA; (2) the employer had notice of her disability; (3) plaintiff could perform the essential functions of his job with reasonable accommodation; and (4) the employer refused to make such accommodations.  *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006); *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013).  "To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).  Defendant argues that Plaintiff's ADA claim fails because Plaintiff does not allege that she is disabled within the meaning of the ADA, that she could perform the essential functions of her job, that a reasonable accommodation was required, or that Plaintiff suffered an adverse employment action because of her disability.  However, because the Court finds that Plaintiff has not pleaded a disability, the Court dismisses Plaintiff's claim on that ground alone.

Under the ADA, the term "disability" means, with respect to an individual: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

Until 2008, the ADA did not define the term "major life activities."  Instead, courts relied upon guidance from the regulations interpreting the Rehabilitation Act of 1973 and the EEOC regulations interpreting the ADA.  *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184,

7

197 (2002) (defining "major life activities" to refer to "those activities that are of central importance to daily life."); *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (noting that "EEOC regulations define 'major life activities' to include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working'" (quoting 29 C.F.R. § 1630.2(i)).

In 2008, Congress expanded the class of individuals considered disabled by enacting the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3555 (codified at 42 U.S.C. §§ 12102(1)–(2)). In addition to those activities that were previously included by regulation as major life activities, the ADAAA created § 12102(2)(B) to include the operation of major bodily functions. *See Alexiadis v. N.Y. College of Health Professions*, 891 F.Supp.2d 418, 428 (E.D.N.Y. 2012) (Bianco, J.); *Kravtsov v. Town of Greenburgh*, 2012 WL 2719663, at *10 n.25 (S.D.N.Y. 2012). In its present form, the ADAAA divides "major life activities" into two categories and gives nonexclusive examples of each:

> **(A) In general**
>
> . . . [M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
>
> **(B) Major bodily functions**
>
> . . . [A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102(2).

The statute also instructs that the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4); *see Bernheim v. N.Y.C. Dep't of Educ.*, 2021 WL 2619706,

at *8 (S.D.N.Y. 2021); *Grullon v. Admin. for Children's Servs.*, 2021 WL 981848, at *12 (S.D.N.Y. Mar. 16, 2021).

Under the statute, however, it is not sufficient for a plaintiff to simply identify an impairment in her complaint or to state the major life activities the impairment affects. *See Addoo v. NYC Bd. of Ed.*, 268 F. App'x 141, 142–43 (2d Cir. 2008) (summary order) ("Because Addoo could not prove that her purported impairment substantially limits one or more major life activities, she could not prevail under the ADA," (quotation omitted)); *Marshall v. Westchester Med. Ctr. Health Network*, 2024 WL 665200, at *10 (S.D.N.Y., 2024) ("[m]erely having an impairment that *affects* a major life activity does not make one disabled for purposes of the ADA") (quoting *Kelly v. Rice*, 375 F. Supp. 2d 203, 207 (S.D.N.Y. 2005)); *Shine v. N.Y.C.H.A.*, 2020 WL 5604048, at *5 (S.D.N.Y. 2020) ("[A]lthough Shine's alleged impairments may well rise to the level of cognizable disabilities, she has failed to allege sufficient detail with respect to how her impairments *substantially limit* one or more major life activities." (emphasis added)). The statute requires, and therefore a complaint must allege, that the impairment "substantially limits" a major life activity. *See Capobianco*, 422 F.3d at 56 ("there are two requirements: the impairment must limit a major life activity and the limitation must be substantial"); *Collins v. Giving Back Fund*, 2019 WL 3564578, at *19 (S.D.N.Y. 2019); *Perez v. N.Y. Presbyterian/Weill Cornell Medical Center*, 2024 WL 1514216, at *5 (S.D.N.Y., 2024) (holding that merely alleging a major life activity is affected is insufficient). The ADA does not define the phrase "substantially limits," but the EEOC regulations provide that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(1)(ii).[3]

---

[3] The EEOC regulations state:

Where a plaintiff invokes subsection 12102(2)(A), it is not sufficient for the plaintiff to claim that she has an impairment that limits activities such as "caring for [her]self, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The plaintiff must allege facts plausibly suggesting that the impairment "substantially" limits one or more of such activities. "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Capobianco*, 422 F.3d at 57.

There is a less well-developed body of law addressing the facts a plaintiff must plead when alleging an impairment that substantially limits a major bodily function under subsection 12102(2)(B). A court in this Circuit has held that a rational factfinder could find that an HIV-positive plaintiff was disabled because the infection "substantially limit[ed] the major life activity of [the plaintiff's] immune system." *Alexiadis*, 891 F. Supp. 2d at 428–30. The plaintiff offered evidence of hospitalizations due to staphylococcal infections, difficulty recovering from injuries, and low T-cell levels. *Id.* at 429.

---

> An impairment is ability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

*Id.* "Although these EEOC regulations do not bind courts, they do provide courts 'with guidance' in interpreting the ADA." *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 347 (E.D.N.Y. 2010) (Bianco, J.) (quoting *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998)).

Other courts outside this Circuit have held that a cancer diagnosis can be sufficient to constitute a disability based on the disease's impact on normal cell growth. *See, e.g.*, *Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 172 (3d Cir. 2017) ("We agree that cancer can—and generally will—be a qualifying disability under the ADA"); *Coker v. Enhanced Senior Living, Inc.*, 897 F.Supp.2d 1366, 1375 (N.D.Ga. 2012) ("[T]he Court finds, as a matter of law, that Plaintiff's breast disease constitutes a 'disability' under the ADA . . . in light of the unrebutted affidavit testimony of Plaintiff's treating physician . . . that Plaintiff's breast disease is the result of abnormal cell growth and abnormal endocrine and reproductive functioning." (quotation omitted)); *Fishbeck v. Lavaca Cnty., Tex.*, 2025 WL 662049, at *7 (S.D. Tex., 2025) (holding that having cancer is a disability because cancer "substantially limits the major life activity of normal cell growth"); *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011) (holding that renal cancer qualifies as a disability even if the only major life activity it substantially limited was normal cell growth).

The regulations implementing the ADA suggest that certain conditions, by their very nature, substantially limit one of the major bodily functions:

> Deafness substantially limits hearing; blindness substantially limits seeing; an intellectual disability (formerly termed mental retardation) substantially limits brain function; partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; autism substantially limits brain function; cancer substantially limits normal cell growth; cerebral palsy substantially limits brain function; diabetes substantially limits endocrine function; epilepsy substantially limits neurological function; Human Immunodeficiency Virus (HIV) infection substantially limits immune function . . .

29 C.F.R. §1630.2(j)(3)(iii).  In other words, some diagnoses are synonymous with substantial limitation of a certain major bodily function.  At the same time, not every condition that has the potential to impact a major bodily function by definition "substantially limits" that function.  *See, e.g.*, *Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015) (holding that even if thermoregulation is

11

a major bodily function, the plaintiffs were not disabled because there was no evidence that they "ever experienced difficulty in thermoregulating"); *Alston*, 679 F. App'x at 172 (affirming summary judgment in favor of defendant where the plaintiff "never claimed at any stage of this litigation that her [breast cancer] limited any substantial life activity, including immune system function or normal cell growth" and repeatedly averred "that she was not substantially limited in any major life activity, including her work, her ability to drive, or her ability to take care of herself or her household"); *Zuckerman v. GW Acquisition LLC*, 2021 WL 4267815, at *11 (S.D.N.Y. 2021) (holding that a generalized anxiety, disorder unlike other mental health diagnoses, does not per se qualify as an impairment that substantially limits "brain function").

Plaintiff has not alleged sufficient facts to establish that she has a disability. Plaintiff states merely that she has anemia and then recites the Mayo Clinic's definition of anemia without providing any facts about her specific diagnosis or experience with anemia. Am. Compl. ¶ 13.[4] Those allegations fail to show that anemia substantially limits any of Plaintiff's general major life activities under § 12102(2)(A) or major bodily functions under § 12102(2)(B).

First, Plaintiff does not identify any activities of daily living such as seeing, hearing, walking, sleeping, reading, or concentrating, that her anemia impacts in any way, let alone

---

[4] Plaintiff claims in her memorandum of law in opposition to the motion to dismiss that she alleges "that *her own* anemia 'is a physical impairment that substantially limits the major bodily functions of normal cell growth and the circulatory system; it is a physical impairment resulting from a condition that prevents the exercise of normal bodily functions such as normal cell growth and the circulatory system; and, it is an impairment of the hemic system of the body.'" Dkt. No. 30 at 4 (quoting Am. Compl. ¶ 19). However, the actual text of the amended complaint reveals that the quoted allegation is a generalized description of anemia and not an individualized account of Plaintiff's own experience with anemia. Am. Compl. ¶ 19 ("Plaintiff's anemia qualifies as a disability under the ADA, the NYSHRL and NYCHRL as anemia is a physical impairment that substantially limits the major bodily functions of normal cell growth and the circulatory system . . ."). That conclusory allegation provides no facts about either Plaintiff in particular or anemia in general beyond what is stated in the Mayo Clinic's definition.

substantially limits. She provides no information concerning the severity, duration, or frequency of her alleged affliction. *Id.* Although her cited definition states that "[h]aving anemia *can* cause tiredness, weakness and shortness of breath," Am. Compl. ¶ 13 (emphasis added), Plaintiff does not allege that she herself has ever experienced tiredness, weakness, or shortness of breath as a result of anemia. She does not allege whether her anemia was chronic or had flared up in the past, or whether she had previously required medical leave or treatment.

Second, Plaintiff does not allege that her anemia substantially limits any of her major bodily functions such as circulatory or hematological functions. Her recitation of the Mayo Clinic's definition is insufficient to support the inference that anemia necessarily causes substantial hematological limitation such that any person with anemia is inherently disabled within the meaning of the ADA. It states that a person with anemia does not have "enough healthy red blood cells or hemoglobin to carry oxygen to the body's tissues," but goes on to acknowledge that "[t]here are many forms of anemia." *Id.* Some can be short term or mild. *Id.* Some can be long term or severe. *Id.* The definition thus spans both a person who, on a transitory or temporary basis, has too few red blood cells and a person with a long-term and severe deficit of red blood cells. Merely stating that anemia affects the hematological or circulatory system is not enough to establish that it *significantly limits* the operation of those systems within Plaintiff. *See Capobianco*, 422 F.3d at 56. Plaintiff does not allege facts showing that that her anemia substantially limits the operation of one or more of her major bodily functions.

Courts have consistently held that merely stating a diagnosis of anemia is insufficient to demonstrate a substantial limit on a major life activity. *See, e.g.*, *Martin v. Teleperformance Inc.*, 839 F. App'x 443, 445 (11th Cir. 2021) (holding that bloodwork indicating that the plaintiff has anemia is insufficient to establish a disability within the meaning of the ADA); *Cash v. Magic City*

13

*Motor Corp.*, 2017 WL 281755 (W.D. Va. 2017) (noting that "[w]hile Cash does plead that anemia 'may make you feel tired and weak,' he has not pled that *his* anemia made *him* feel tired or weak" and holding plaintiff failed to plead facts supporting the inference he was disabled)). Something more is required. *See Thomas v. Bala Nursing & Retirement Ctr.*, 2012 WL 2581057, at *2, 6 & n.14 (E.D. Pa. 2012) (denying summary judgment for the defendant because the plaintiff alleged that her anemia "affected her ability to stand for a long period of time, occasionally limited her ability to think or concentrate, caused shortness of breath when she would walk fast or run, and caused her to sleep up to twelve hours per day"); *Wright v. Mo. Dep't of Mental Health*, 2019 WL 2085417, at *2 (E.D. Mo. May 13, 2019) (holding plaintiff's allegations of "anemia and myelogenous leukemia that lowers his white blood cell count, raises his risk for infection, and causes back pain and sensitivity to cold," paired with the side effects of chemotherapy, showed a substantial limit on a major life activity).

Because Plaintiff fails to plead that she is disabled within the meaning of the ADA, her ADA claim is dismissed without prejudice.

## II.     NYSHRL AND NYCHRL

In addition to her federal ADA claim, Plaintiff brings claims for failure to accommodate her disability under the NYSHRL and NYCHRL. Am. Comp. ¶¶ 79–84. "A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case in which all federal-law

14

claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7); *see also Bordeaux v. Halstead Prop. Dev. Mktg. LLC*, 2022 WL 484992, at *15 (S.D.N.Y. Feb. 16, 2022). Pursuant to its discretion under 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's claims under the New York State Human Rights Law and the New York City Human Rights Law, and these claims are likewise dismissed without prejudice.

## CONCLUSION

Defendant's motion to dismiss is granted without prejudice. Plaintiff may file an amended complaint no later than 30 days after this Opinion and Order. If Plaintiff fails to file an amended complaint by that date, the Court will direct the Clerk of Court to close the case.

The Clerk of Court is respectfully directed to close Dkt. No. 25.

SO ORDERED.

Dated: May 7, 2025
      New York, New York

                                                  LEWIS J. LIMAN
                                                  United States District Judge